IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

| | |
|---|---|
| TRACY S. WILLIAMS, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | )   CIVIL ACTION NO. 1:14-CV-58 (MTT) |
| | ) |
| DOUGHERTY COUNTY SCHOOL SYSTEM, | ) |
| | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

## ORDER

Plaintiff Tracy Williams, who is African-American, alleges that Defendant

Dougherty County School System ("DCSS") discriminated against her on the basis of

her race[1] in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et*

*seq*, and 42 U.S.C. § 1983 during her employment at DCSS.  (Doc. 3).  She also

alleges that DCSS retaliated against her in violation of Title VII.  (*Id.*).  DCSS moved for

summary judgment.  (Doc. 19).  The motion is **GRANTED**.

## I.   BACKGROUND[2]

Williams was hired by DCSS as Director of Human Resources in September

2009.  (Doc. 38-2, ¶ 1).  Robert Lloyd, who is white, was DCSS's Executive Director of

Finance and Operations and her direct supervisor.  (Docs. 21 at 9:14-15; 38-2, ¶ 2;

---

[1] Although the parties mention a gender claim, the Amended Complaint does not, as discussed below, assert a gender discrimination claim.

[2] The Court relies on undisputed facts and has drawn all reasonable inferences in the light most favorable to Williams.  Williams filed objections to affidavits submitted by Dougherty County Board of Education members Darrel Ealum and Carol Tharin as hearsay.  (Docs. 43-1; 43-2).  To the extent these affidavits contain information not within the affiants' personal knowledge, the Court has relied on the affidavits as information upon which Board members relied when they voted to terminate Williams.

38-3, ¶ 10).  DCSS fired Williams largely based on information gathered by Lloyd and replaced her with an African-American.  (Docs. 19-2 at 5-6; 38-2 at 9).  Apart from this, about the only thing clear from the record and the briefs is that Williams and Lloyd, who also no longer works for DCSS, had an acrimonious relationship, and the office in which they worked was dysfunctional.  The Court has had considerable difficulty putting Williams's allegations, which span almost two years, into any chronological context, particularly her allegations about a "pay discrepancy study" that apparently forms the basis of her retaliation claim.  For example, Williams's statement of disputed facts devotes ten paragraphs to the study, none of which contain a date, despite the fact that she seems to rely on temporal proximity to prove causation.  (Doc. 38-1, ¶¶ 12-15, 20-22, 35, 38, 42).  In an effort to bring some clarity to the matter, the Court ordered the parties to provide further information about the alleged pay discrepancy study.  (Doc. 47).  The parties' responses clarified little.  (Docs. 48; 49).  For example, Williams submitted a new declaration which appears to conflict with her Amended Complaint and a previous declaration, and she still provides no dates regarding the study.[3]

After DCSS hired Williams in September 2009, she says she and Lloyd got along fine for a while, but at some point, he began to demean, berate, and harass her.  (Docs. 29 at 30:10-34:19, 37:12; 38-1, ¶ 11; 38-3, ¶¶ 10-12, 14).  Williams's testimony about when this change came about varies.  At times, she suggested that the change occurred, for no apparent reason, before August 2010.  (Doc. 29 at 30:8-10, 34:16-19,

---

[3] The Amended Complaint alleges that "[s]he was told by one of the white board members that she needed to go sit down and be a good little human resources lady when she raised the issue of disparity of pay between similarly situated black and white employees."  (Doc. 3 at 7).  In Williams's initial declaration, she stated: "Ms. Tharin [a DCSS Board member] in Paragraph 6 [of her affidavit] says she was not aware of any study or issue of pay discrepancies—I made a report to the board on a monthly basis which was at the board's request."  (Doc. 38-3, ¶ 34).  In her second declaration, filed in response to the Court's request for more information about the pay discrepancy study, she states:  "I did not make a report to the board about the pay discrepancy study."  (Doc. 49-1, ¶ 3).

37:6-15).  But it seems the real deterioration began after Lloyd got into a fistfight with DCSS's Director of Communications on August 11, 2010.  (Docs. 29 at 19:3-12, 20:16-18, 21:20-22; 38-1, ¶ 16; 38-3 at 29-30).  Williams drafted for then-Superintendent Joshua Murfree, who is African-American, a letter to Lloyd about the incident.[4]  (Doc. 38-3 at 32).  Her draft cited Lloyd's "deplorable and disgraceful behavior in creating a hostile work environment and committing acts of workplace violence."  (*Id*.).  She went on to say that "[t]hese acts of violence are intolerable and deplorable" and noted that Lloyd "single-handedly escalate[d] this situation, … demonstrated no leadership ability in this situation, extremely poor interpersonal skills, behavior that is aggressive and predatory, [and] caused fear among the staff."  (*Id*.).  Williams recommended that Lloyd be fired.  (*Id*.).  According to Williams, Lloyd somehow intercepted her draft, and instead of being fired, Lloyd was suspended for five days.  (*Id*., ¶ 15).

Williams testified that after her recommendation to fire Lloyd, "the atmosphere completely changed."  (Doc. 29 at 26:22-23).  Lloyd "became even more harsh and rude" and instituted a "campaign of harassment" against her.  (Doc. 38-3, ¶¶ 16, 18).  He interrupted her staff meetings to ask questions and, in the presence of other staff members, made snide remarks about her and suggested she was incompetent.  (*Id*., ¶ 16).  When she asked two white managers, Herb Benford and Alan Skinner,[5] whether Lloyd treated them the same way, they told her he did not.  (*Id*.).  Lloyd also countermanded her recommendations, prevented her from disciplining her employees

---

[4] Murfree also is no longer employed by DCSS.  Perhaps consistent with the apparent dysfunctionality of the DCSS head office, he repeatedly refused to answer questions in his deposition, frustrating both lawyers and leading them to threaten to call the Court.  (Doc. 28 at 31:23-32:24, 69:9-74:9).

[5] Benford was the Director of Information Systems, and Skinner was the Co-Facilities Director.  (Docs. 29 at 41:16-17; 38-3, ¶ 21).

for poor job performance, told her staff that they did not have to listen to her, and would

not allow her to hire additional staff to fill open positions in her department.  (*Id.*, ¶¶ 11,

14, 26).

For his part, Lloyd began documenting Williams's alleged shortcomings.  On

August 18, 2010, he wrote Williams a letter of reprimand to "officially set out [his]

concerns over [her] leadership of the Human Resources Department."[6]  (*Id.* at 36).  In

the letter, he criticized her "confrontational nature" and "aggressive approach," noting

that concerns about her abilities have been raised in the "squawk" section of the local

newspaper.  (*Id.*).  Furthermore, members of the staff complained about her "aggressive

nature" and said they felt bullied and frightened, all of which had resulted in an

"unhappy working environment."  (*Id.*).  Lloyd wrote that members of the public had also

complained to him after visiting Human Resources.  (*Id.*).  Williams claims Lloyd "ma[de]

sure that this reprimand was on television and social media."  (*Id.*, ¶ 24).

In April 2011, Lloyd followed up on his reprimand.  (Doc. 21 at 146-51).  He

documented two additional meetings with Williams but noted that she "continued to

systematically bully and harass the staff in Human Resources."  (*Id.* at 146).  He

identified eight employees that Williams had "'run off' or had terminated … by her

bullying tactics."  (*Id.*).  For example, he wrote that one employee requested a transfer

to a lower-paying job to escape the "constant abuse and stress" of working with

Williams because she "feared for the health of her unborn child."  (*Id.*).

Lloyd wrote that Williams had made inappropriate staffing changes, claiming that

she "believes that procedures do not apply to her and her actions and she seems to

---

[6] Williams, citing O.C.G.A. § 20-2-944, is adamant that only the superintendent can issue a letter of reprimand.  (Doc. 38-3, ¶ 23).  However, the legal validity of the reprimand is not at issue.

have a false impression of her power and her importance!!!" (*Id.* at 147).  His memorandum provided considerable detail supporting this allegation.  For example, Williams's actions led to the resignation of one employee who said in her resignation letter that she had been "harassed, retaliated against, [and] verbally abused" by Williams.  (*Id.*).

Lloyd then described Williams's poor job performance.  She had an "ongoing 'run in'" with the curriculum department that jeopardized a $1.5 million grant.  (*Id.* at 148). Teachers complained about the timeliness of their certification, and Williams posted inaccurate information on the website about the certification process.  (*Id.* at 149). Williams also mismanaged the time of a consultant hired to program an online application process, and although she had promised the system would be ready by July 2010, it had not been completed by January 2011.  (*Id.* at 149-50).  She was responsible for a "debacle" involving the use of Google Docs, which did not comply with established document control procedures, instead of software purchased by the school system for this purpose.[7]  (*Id.* at 149).  Williams also failed to attend a quarterly Management Review Team meeting with the other directors because, according to her, she was interviewing a teacher, even though the time had passed for hiring teachers. (*Id.* at 150).  She was also rude to a standards auditor, jeopardizing the certification that DCSS "worked exceptionally hard to obtain." (*Id.*).  Finally, Lloyd reported that Williams had not attended courses on interpersonal skills and leadership training as he asked in his reprimand the previous August.  (*Id.*).

---

[7] The exact nature of the "debacle" is unclear from Lloyd's memorandum.  It is, however, apparent that the use of Google Docs was inappropriate.

Based on all this, Lloyd reported that he would continue to monitor Williams's progress and would re-assess her position in the school system in three months. (*Id.* at 151).

Lloyd's memorandum and accompanying statements from DCSS employees[8] seem to be some or all of the "untruths" and "false claims" Williams alleges Lloyd fed Board members that ultimately led to her termination. (Doc. 38-3, ¶¶ 18, 20, 25). Williams is never clear about what the untruths and false claims were, but she is emphatic that Lloyd was behind them. (*Id.*).

Williams was fired twice. On May 11, 2011, the Board voted three to two to fire Williams. (Docs. 21 at 162; 38-2, ¶ 5). David Maschke, Tharin, and Ealum voted in favor of termination. (Doc. 38-2, ¶ 5). Maschke testified that he voted to terminate Williams because "she had become a disruptive person that … was bullying people, rude to employees, rude to candidates, [and] didn't seem to be able to manage her position." (Doc. 26 at 34:12-19). He said he had received more complaints about Williams from DCSS employees than any other employee during the twelve years he served on the Board. (*Id.* at 31:21-25). He described complaints that Williams was not helpful when people tried to apply for positions, that she bullied people, and that

---

[8] Lloyd collected statements from several of the individuals listed in the April memorandum. These statements describe in considerable detail Williams's alleged problems. For example, the benefits coordinator said that, while Williams has good ideas, she "does not have the people skills. She talks to you as if you are nobody (belittle) and acts as if no one has good sense but her. She always finds someone to pick on and harass. … It appears that she has to have someone to bully. Where is the relief? Morale is low in the department, employees are intimidated by her because she is vindictive and they are afraid of losing their job." (Doc. 21 at 174). The payroll coordinator, who decided to quit her job at DCSS rather than continue working under Williams, described Human Resources as being in a "constant state of chaos" under Williams's management. (*Id.* at 170-71). The personnel coordinator described Williams as "rude and combative" and complained that she was "constantly being harassed" by Williams. (Doc. 23 at 66-67). Williams disputes the truth of these statements. (Docs. 38 at 3; 38-1, ¶¶ 5-7; 38-3, ¶¶ 13-14, 17).

principals could not get records they requested from Human Resources.  (*Id.* at 32:3-11).

Tharin voted to terminate Williams because she "received information from various sources about Ms. Williams'[s] unprofessional behavior toward her employees, her insubordinate conduct, and her attempts to violate board policy and state law by terminating employees without board approval."  (Doc. 19-2, ¶ 3).

Like Maschke, Tharin also received calls about Williams from "various employees," although she does not describe the content of those calls.  (*Id.*).  She personally observed that Williams was "disrespectful and rude toward school board members and other administrators."  (*Id.*).  Her impression was that Williams "was causing problems and dividing the school system."  (*Id.*).

Ealum voted to terminate Williams "based … on [his] personal observation of her conduct before the board of education as well as complaints [he] received from other employees."  (Doc. 19-3, ¶ 3).  His impression was that Williams "believed she possessed more power than she actually did" and "believed she was the hiring and firing authority of [DCSS] and that the superintendent and Board of Education were only there to sign off on her decisions."  (*Id.*).  Lloyd had told him Williams tried to fire employees without Board authority.  (*Id.*).

However, because a majority of the full board did not vote for Williams's termination, it was not final.[9]  (Doc. 21 at 162).  The Board met again on May 25 and reinstated Williams but placed her on a Performance Development Plan ("PDP").  (Doc. 38-2, ¶ 6).  The PDP was short-lived.  According to Murfree and Lloyd, Williams was

---

[9] There were seven Board members.  (Doc. 26 at 33:23).  When a majority of the total board does not vote for or against a decision, it can be reconsidered within 30 days.  (*Id.* at 33:22-34:2).

involved in yet another incident with an employee in August.  (Docs. 19-2, ¶ 5; 21 at 125:10-21).  This time, according to their reports to the Board, Williams pushed the employee into a file room and possibly locked her in.  (Docs. 19-2, ¶ 5; 21 at 103:21-24; 26 at 36:23-25; 27 at 34:12-35:17).  According to Lloyd, the employee "was uncontrollably sobbing and everyone kept on telling [Lloyd] that she had been bullied and harassed and could take no more."  (Doc. 21 at 103:21-24).  Murfree instructed Lloyd to send Williams home because of the incident.  (*Id.* at 103:24-25).  Although Williams now disputes this version of the incident, it is undisputed that Lloyd and Murfree's version of the incident was presented to the Board.[10]

On September 6, DCSS's attorney prepared a lengthy report for the Board about the allegations against Williams.[11]  (Doc. 19-2 at 5-6).  The attorney reported that he had reviewed documents provided by Lloyd and "files of certain employees wrongfully terminated or demoted by Ms. Williams."  (*Id.* at 5).  He noted that "Lloyd has meticulously [sic] recorded those events regarding the conduct of Tracy Williams," including a "lengthy memo" accompanied by "documents and complaints from other staff members."  (*Id.* at 6).  The attorney described a "pattern of abuse and bullying" in Lloyd's documents, which "demonstrate that Ms. Williams has been abusive to subordinates as well as senior staff."  (*Id.*).  He reported that "a number of long time employees [chose] to resign" rather than to continue working with Williams and that

---

[10] Williams contends in her declaration that the employee was upset because she was behind in her work, and Williams says that she took the employee into the file room to comfort her, closing the door for privacy.  (Doc. 38-3, ¶ 33).

[11] Williams objects to the attorney's report because it "is full of conjecture, hearsay, unfounded conclusions and purely objectionable information based on no adequate foundation for any of these statements made in the letter."  (Doc. 43-1, ¶ 6).  The Court considers the letter only for the purpose of establishing information upon which the Board based its decision.  Clearly, the Court gives no consideration to the attorney's legal opinions and conclusions.

Human Resources staff was "completely demoralized." (*Id.*). He also noted that Williams inappropriately signed documents on behalf of teachers, was the subject of an ethics investigation, and was producing "substandard" work product. (*Id.*).

The attorney further reported that "Williams has consistently usurped the authority of the Board" by making personnel decisions without Board authority, creating potential liability for DCSS. (*Id.* at 5). Furthermore, even though the attorney and other staff members had discussed the problem with her "on numerous occasions," "Williams has continued to operate in a manner inconsistent with the law and the policies of [DCSS]." (*Id.* at 6).

In its September 12 meeting, the Board voted five to one to fire Williams. (Doc. 38-2, ¶ 7). It is clear that the Board relied heavily on Lloyd's voluminous documentation of Williams's alleged misconduct and the attorney's letter, which was based in part on Lloyd's documentation. In addition, Lloyd appeared before the Board in executive session and "ran down a list of things that Ms. Williams had done, the reasons he was recommending her to be terminated." (Doc. 27 at 36:4-7). Lloyd testified that he believed the file room incident was the "catalyst" for Williams's termination, and one Board member testified that this incident brought the termination decision "to the head." (Docs. 21 at 125:22-24; 27 at 34:13-16). By this "point even [Murfree] was ready to recommend termination." (Docs. 26 at 64:1-5, 55:21-56:6; 19-2, ¶ 5; 19-3, ¶ 4). After the meeting, Murfree wrote Williams and informed her that he "recommended to the Board that [she] be released … and the Board approved the recommendation." (Doc. 21 at 168).

Turning to the confusing allegations about the pay discrepancy study, Williams claims Murfree asked her in about June 2010 "to look into pay discrepancies which he had learned about." (Doc. 38-3, ¶ 9). Murfree testified that when he became superintendent in June 2010, he recommended that a pay study be conducted, and he confirmed that he asked Williams to conduct the study. (Doc. 28 at 12:20-22, 80:15-24). Murfree also testified, however, that Williams "said that was something she was already doing," and Williams argues she began the study "because complaints continued to be made that African-American employees were not getting paid comparable to their white counterparts." (Docs. 28 at 80:18; 49 at 3). In any event, Williams claims that at some unspecified time she gave the completed study to Murfree who "advised [her] not [to] share this report with others … ." (Doc. 49-1, ¶ 3). However, Murfree testified that he never discussed the results with Williams or even saw the results. (Doc. 28 at 80:25-81:5). Williams's second declaration makes clear that the Board never saw the report either. (Doc. 49-1, ¶ 3). *See supra* note 3.

Williams also did not provide the Court with a copy of the study, despite being ordered to do so. (Doc. 47). In response to the Court's order, Williams clarified that she is not alleging she was retaliated against for presenting the completed study to Murfree or the Board. (Doc. 49 at 3). Rather, she is alleging that Lloyd retaliated against her for *working* on "a study relating to the pay discrepancy of African-Americans, people who had asked Mr. Lloyd to fix their pay issue but he refused." (Doc. 49 at 3). Williams testified that "people would come to [her] office and they would explain to [her] that they had been to Mr. Lloyd [about their pay], but no resolution had occurred based on their allegations." (Doc. 29 at 23:19-24). Williams says she began "accumulating data based

on individual situations" and found a "pattern," which was that "overwhelmingly the people that were complaining were African-American." (*Id.* at 24:9-17). Williams says that she never provided the pay discrepancy study to Lloyd "simply because he wouldn't accept one whole document." (*Id.* at 80:19-81:1). Instead, she says she presented cases of pay discrepancies to him on a "case by case basis" and provided him with data regarding "every one of the people in the study." (*Id.* at 24:20-21, 80:20-22).

Apparently Williams started this process before the tumultuous events of August 2010. Initially, Lloyd was polite but would not act on her reports. (*Id.* at 25:15-16). She testified that he "would, basically, ignore [her]" and that he "was very difficult to work with because he would not move in terms of [her] presenting information to him." (*Id.* at 25:4-10). But that changed dramatically after Lloyd's fight and her recommendation that he be terminated: "I continued to ask him about the pay discrepancy and after the August situation he became hostile and the relationship, basically, began to float downstream." (*Id.* at 24:25-25:3). As she continued to present Lloyd with alleged pay discrepancies, he became more "antagonistic," "more difficult to work with," and "nastier," and "it got to the point where you couldn't speak to him about anything related to anyone's pay or any type of situation." (Docs. 29 at 82:1-5; 38-3, ¶ 19).

The record reveals nothing further about when she reported to Lloyd, when she gave the results of the pay discrepancy study to Murfree, or whether she stopped reporting to Lloyd after Murfree told her not to discuss the results with anyone. Neither is the study itself in the record. Williams's testimony about what she told Lloyd and what discrepancies she uncovered is also sparse. She testified that at some point she started presenting the information in "categories," such as teachers, substitutes, and

staff members.  (*Id.* at 81:4-10).  She testified to the names of several African-American

employees who she says had "discrepancies," although she says nothing about the pay

they received or should have received.  (*Id.* at 83:15-16).  She also testified that bus

drivers and custodial staff were complaining about their pay, and "[i]t was discovered

that people would have three different assignments just to get a decent wage."[12]  (*Id.* at

82:5-15).  Without providing any specifics, she testified that she determined these

people were being underpaid and that they "all happened to be African-American."  (*Id.*).

Williams testified that "what [she] discovered was if Mr. Lloyd had a beef with a

person for whatever the reason … he did not show any interest in resolving their

situation."  (*Id.* at 81:21-25).  When asked why Lloyd did not want to acknowledge the

pay discrepancies, Williams testified that she thought it "was because Mr. Lloyd didn't

want to take the information from [her, and] [h]e didn't want to address it because these

situations preceded [her]."  (*Id.* at 84:12-85:16).

Lloyd denies that he knew anything about Williams's study and her purported

attempts to correct the pay of African-American employees.  (Doc. 21 at 109:25-

111:21).  Lloyd testified that employee pay was set according to a recent "total survey of

all of [DCSS's] pay scales [that occurred] prior to Ms. Williams getting there."  (*Id.* at

110:6-13).  He said that the survey involved comparing DCSS with "similar systems,"

and as a result of the survey, the pay scale for some jobs was increased and for others

---

[12] Then-Assistant Superintendent Kenneth Goseer testified that he met with the bus drivers about their pay.  (Doc. 37 at 14:13-20).  The bus drivers, who were predominantly African-American, "complained about their salaries versus cities of comparable size and what those folks were making and what they were making."  (*Id.* at 14:24-15:9).  "[O]ne of the main contentions of several of the bus drivers," according to Goseer, was that "they thought their race played [a] part in not getting the salaries they thought they should."  (*Id.* at 15:17-21).  They told Goseer that "[i]f they were of other persuasion … their salaries would be comparable to the other folks in other cities."  (*Id.* at 15:22-25).

it was reduced.  (*Id.* at 110:10-13, 111:12-15).  Pay was then determined by the employee's years of experience and qualifications.  (*Id.* at 110:12-13).

After she was fired in September, Williams filed an EEOC complaint, and she received a right-to-sue letter from the EEOC on January 6, 2014.  (Doc. 38-2, ¶ 8).  The EEOC determined that Williams "was retaliated against by being discharged after she repeatedly complained about differences in pay among African-American employees and their non-African-American counterparts."  (*Id.* at 12).  However, the EEOC's decision does not provide the basis for its conclusion.

## II.  DISCUSSION

### A.  Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'"  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movant may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).

The burden then shifts to the non-moving party, who must rebut the movant's showing "by producing … relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  The non-moving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable, or is not significantly probative' of a disputed fact."  *Id.* (quoting *Anderson*, 477 U.S. at 249-50).  Further, where a party fails to address another party's assertion of fact as required by Fed. R. Civ. P. 56(c), the Court may consider the fact undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2).  However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. … The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255.

**B.     The Plaintiff's Failure to Timely Serve Her Amended Complaint and the Defendant's Failure to Timely File its Motion for Summary Judgment**

DCSS contends it is entitled to summary judgment because the Amended Complaint was not timely served.   (Doc. 19-1 at 6-8).  Williams contends that DCSS's motion for summary judgment should be denied because it was not timely filed.  (Doc. 30).  Both parties claim extenuating circumstances and misunderstandings excuse their deficiencies.  Given the confusing summary judgment record, it is tempting to dispose of either the case or the DCSS's motion on technical grounds, but the Court prefers to review the case on its merits.  However, it is worth mentioning that DCSS did not move on its service defense at the outset of this case but rather engaged in extensive discovery and only then pressed the issue.  DCSS's motion for summary judgment on

the grounds of untimely service is **DENIED**, and Williams's request to deny DCSS's

motion for summary judgment as untimely is **DENIED**.[13]

## C.    Analysis

### 1.    No Gender Discrimination Claim

While DCSS moves for summary judgment on Williams's gender claim, her

Amended Complaint does not state a claim for gender discrimination.  The substantive

counts of her Amended Complaint are clearly based only on alleged race discrimination.

(Doc. 3, ¶¶ 17-25).  Gender is twice mentioned in her preliminary allegations but in

rather odd ways.[14]  In paragraph 10, she alleges DCSS discriminated against her

"because of her race, gender in that defendant treated Plaintiff differently than it treated

similarly situated *white* employees." (*Id.*, ¶ 10) (emphasis added).  She makes an

identical allegation in paragraph 16.  (*Id.*, ¶ 16).   Although her response brief contains a

two-sentence paragraph stating the elements of a prima facie case for gender

discrimination, she points to no factual or legal support for these claims as required by

Fed. R. Civ. P. 56.  (Doc. 38 at 21).  Finally, even if Williams had pled and briefed a

gender discrimination claim, as discussed below, nonpretextual legitimate,

nondiscriminatory reasons existed for any adverse employment actions.  Therefore,

---

[13] In any event, the Court would deny DCSS's motion given Williams's explanation and the potential consequences of a dismissal.  *See Horenkamp v. Van Winkle & Co., Inc.*, 402 F.3d 1129, 1133 (11th Cir. 2005) (holding that extending the 120-day time limit for service was permissible even in the absence of good cause when dismissal would foreclose the plaintiff's claim); *Rhodan v. Schofield*, 2007 WL 1810147, at *5 (N.D. Ga.) (finding good cause to extend the 120-day period because of the "harsh result" that the statute of limitations "would functionally bar" the claim if dismissed.).

[14] As discussed in footnote 3, the Amended Complaint does allege that a Board member told Williams to "go sit down and be a good little human resources lady when she raised the issue of disparity of pay between similarly situated black and white employees," (Doc. 3 at 7), but she now maintains that she "did not make a report to the Board about the pay discrepancy study."  (Doc. 49-1, ¶ 3).  In any event, Williams never asked the Court to consider the statement as evidence of gender discrimination.

even if Williams had asserted a gender discrimination claim, DCSS would be entitled to summary judgment on any such claim.

### 2. *McDonnell Douglas* Framework

A Title VII plaintiff may prove her case circumstantially when, as here, there is no direct evidence of discrimination. The framework for analyzing circumstantial evidence to establish a prima facie case of discrimination is found in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Pursuant to *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination, the test for which differs slightly depending on the nature of the claim. If a plaintiff establishes a prima facie case of discrimination, the burden of production, but not the burden of persuasion, shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment action. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981). This burden of production means the employer "need not persuade the court that it was *actually* motivated by the proffered reasons" but must produce evidence sufficient to raise a genuine issue of fact as to whether it discriminated against the plaintiff. *Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012) (emphasis added) (internal quotation marks and citation omitted).

A plaintiff then has the opportunity to show that the employer's stated reason is in fact pretext for discrimination. "The plaintiff can show pretext 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Id.* (quoting *Burdine*, 450 U.S. at 256). Put another way, "[a] plaintiff may … survive summary judgment by 'presenting evidence sufficient to demonstrate a

genuine issue of material fact as to the truth or falsity of the employer's legitimate, non-discriminatory reasons.'" *Freeman v. Perdue Farms Inc.*, 496 F. App'x 920, 925 (11th Cir. 2012) (quoting *Evans v. McClain of Ga., Inc.*, 131 F.3d 957, 965 (11th Cir. 1997)). "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000). Thus, the Court must determine "whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (citation and internal quotation marks omitted).

The plaintiff's burden at the pretext stage merges with her "ultimate burden of persuading the court that she has been the victim of intentional discrimination.'" *Flowers v. Troup Cty., Ga., Sch. Dist.*, 803 F.3d 1327, 1336 (11th Cir. 2015) (quoting *Burdine*, 450 U.S. at 256); *see also Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010). Thus, the critical decision "is whether the plaintiff has 'create[d] a triable issue concerning the employer's discriminatory intent.'" *Flowers*, 803 F.3d at 1336 (alteration in original) (citation omitted). "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000); *cf. St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 517 (1993) ("[P]roving the employer's

reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination."). In fact, it will be a "rare case[] where, despite the existence of a *prima facie* case and sufficient evidence of pretext, no rational jury could conclude that the [employer's action] was discriminatory." *Motley v. Fulton Cty., Ga.*, 815 F.3d 733, 734 (11th Cir. 2016) (per curiam).

### 3.   Disparate Treatment Based on Race

#### a.   Title VII and 42 U.S.C. § 1983

Williams brings disparate treatment claims under Title VII and 42 U.S.C § 1983. Title VII and Section 1983 have the same requirements of proof and use the same analytical framework. *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1275 n.5 (11th Cir. 2008). Thus, the Court will address Williams's Title VII claim with the understanding that the same analysis applies to her Section 1983 claim.

#### b.   Prima Facie Case

To establish a prima facie case for disparate treatment, Williams must show that: "(1) [she] is a member of a protected class; (2) [she] was qualified for the position; (3) [she] suffered an adverse employment action; and (4) [she] was replaced by a person outside [her] protected class or was treated less favorably than a similarly-situated individual outside [her] protected class." *Maynard v. Bd. of Regents of the Div. of Univs. of the Fla. Dep't of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003).

Williams acknowledges her burden to prove this prima facie case, but her argument that she has met that burden is difficult to piece together. The fact section of her brief seems to suggest that she contends that white employees were treated differently, an understandable argument given that she was replaced by an

African-American.  (Docs. 19-2 ¶ 6; 38 at 4-5).  Specifically, she says Lloyd, Benford,

and Skinner were not disciplined for conduct that was worse than hers.  (Doc. 38 at

4-5).  However, she has presented no evidence, or even argument, that Lloyd, Benford

and Skinner are valid comparators.  Her burden in this regard is clear.

> When a plaintiff alleges discriminatory discipline, to determine whether
> employees are similarly situated, we evaluate whether the employees are
> involved in or accused of the same or similar conduct and are disciplined
> in different ways.  When making that determination, we require that the
> quantity and quality of the comparator's misconduct be nearly identical to
> prevent courts from second-guessing employers' reasonable decisions
> and confusing apples with oranges.

*Burke-Fowler v. Orange Cty., Fla*., 447 F.3d 1319, 1323 (11th Cir. 2006) (internal

quotation marks, alteration, footnote, and citation omitted).

Having made no effort to meet this burden, the Court has no duty to scour the

record to identify evidence that Lloyd, Benford, and Skinner are valid comparators.  *See*

Fed. R. Civ. P. 56(e); *2025 Emery Highway, L.L.C. v. Bibb Cty., Ga*., 377 F. Supp. 2d

1310, 1333 (M.D. Ga. 2005).  Nevertheless, the Court has examined the record, and it

is clear they are not valid comparators.  Lloyd was involved in a fight with another

employee.  (Doc. 38-3, ¶ 15).  Benford was responsible for routine outages of DCSS

computer systems, and Skinner overspent budgets, missed completion dates, and

employed rapists, murderers, and child molesters.  (*Id*., ¶ 21).  Their conduct is not

"nearly identical" to Williams's.[15]

Williams has not established her prima facie case of disparate treatment.

---

[15] Williams does not contend it is impossible to identify a valid comparator and thus her claim should be
analyzed pursuant to *Holifield v. Reno*, 115 F.3d 1555 (11th Cir. 1997).  Recognizing that there may be
limited options for comparators for plaintiffs in "higher level supervisory positions," the court in *Holifield*
analyzed other evidence to evaluate whether the plaintiff presented sufficient evidence to meet his burden
to "create an inference of discrimination" and establish his prima facie case.  115 F.3d at 1563-64.

### c.     DCSS's Legitimate, Non-Discriminatory Reasons

Even if Williams had established a prima facie case for disparate treatment, DCSS has adduced overwhelming evidence of legitimate, nondiscriminatory reasons for any adverse employment actions.  Over the course of nearly a year, Lloyd amassed voluminous information, including statements from aggrieved employees, documenting Williams's misconduct.  Although the Board members voting to fire Williams in May 2011 presumably relied heavily on Lloyd's allegations, they also relied on other evidence of Williams's misconduct, including personal observations and experiences. After the Board voted to give Williams a second chance, on the condition that she comply with the PDP, she almost immediately caused another controversy by, according to the information provided to the Board by Murfree and Lloyd, cornering an employee in a file room, leaving her sobbing uncontrollably.  Although it appears Murfree apparently was ambivalent at the time of the May 2011 termination, by September he too recommended that Williams be fired.  DCSS's attorney conducted his own investigation and provided the Board with detailed findings of Williams's misconduct.  Clearly, DCSS has met its burden to articulate legitimate, nondiscriminatory reasons for its actions.

### d.     Pretext

In response to DCSS's proffered reasons for its actions,[16] Williams argues that DCSS "has tried to make this lawsuit about disgruntled employees and malcontent board members who heard specious information from [Lloyd]."  (Doc. 38 at 9).  She says that Lloyd led "a group of people … on a campaign to discredit [her], to attempt to

---

[16] Although many of the following quotes explaining Williams's pretext argument read like a monologue in a party's deposition, they all come from Williams's brief.

show that she was hard to get along with, incompetent." (Doc. 38 at 16). The "disgruntled employees … objected to [her] and decided she and her style were not for them," and the "notes and memos from [Lloyd] to [the Board's attorney] were made up from [these] disgruntled employees … who played in the hands of [Lloyd's] concerted effort to discredit [her]." (Docs. 19-2, ¶ 4; 38 at 3, 14; 38-3, ¶ 32). Williams specifically attacks the benefits and payroll coordinators, who, as discussed above, submitted statements to Lloyd describing Williams's alleged problems. (Doc. 38 at 3, 14). According to Williams, these coordinators "did not want to make the changes that [she] asked to be done" and, throughout her tenure, they "were difficult to work with and/or outright defiant in doing what she asked of them." (Doc. 38-1, ¶¶ 5-7).

Similarly, Williams argues that DCSS "attempt[s] to bootstrap three (3) white board members who didn't like [her] and did not want her to continue into a 'crusade' of why [she] was terminated." (Doc. 38 at 9). Williams claims that the testimony of the Board members "point[s] to a culture where it was easy for [Lloyd] to fabricate and orchestrate. Whatever he told them is what they did." (*Id.* at 14). Williams says that Lloyd's "ill will and motives are imputed" to the Board members and that "[t]hey never acted like reasonable board members. No due diligence for them." (*Id.* at 14). Specifically, Williams argues that "Darrell Ealum just plain being rude and obnoxious about her. She is unqualified. Hardly. She can't do her job. Hardly." (*Id.* at 15). Williams provided some evidence that Ealum did not like her because he would remark that she did not know what was going on, and he told her "we will do everything we can to get you out of here." (Doc. 38-3, ¶¶ 36-37).

Williams's conclusory allegations, attacks, and complaints do not meet DCSS's reasons "head on."  *Chapman*, 229 F.3d at 1030.  Williams simply offers her own interpretation of the complaints against her, quarrels with the facts cited by Lloyd and the wisdom of the Board's decisions, and claims she was the victim of a conspiracy. However, the Court does "not sit as a super-personnel department judging the wisdom or accuracy of the employer's decision," and the "inquiry is limited to whether the employer gave an honest explanation of its behavior."  *Robinson v. Colquitt EMC*, --- F. App'x ---, 2016 WL 3090695, at *2 (11th Cir. 2016) (citations and internal quotation marks omitted).  By asserting that she did not do the things she was accused of—and attacking her accusers as "disgruntled employees" who "were difficult to work with"— Williams has shown, at most, that DCSS's decisions were based on erroneous facts. (Docs. 38-1, ¶ 7; 38-3, ¶ 13).  But "[t]he inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of [her] performance."  *Holifield*, 115 F.3d at 1565.  In the face of substantial and broadly based evidence produced by DCSS demonstrating her misconduct and poor performance, Williams cannot simply rely on her "assertions of [her] own good performance."  *Id.*; *see Alvarez*, 610 F.3d at 1266 ("The question is whether her employers were dissatisfied with her for these or other non-discriminatory reasons, even if mistakenly or unfairly so, or instead merely used those complaints about [her] as cover for discriminating against her because of her [race].").

Williams's conclusory allegation that Lloyd led some great conspiracy to get rid of her changes nothing.  The Court accepts that Lloyd disliked Williams because, according to Williams's testimony, of her efforts to get him fired after his fistfight.  But

this dislike does not meet "head on" his detailed documentation of Williams's faults, which included statements from employees who had been victimized by Williams. Williams's response that they too were part of the conspiracy is even more conclusory. In any event, the information gathered by the alleged Lloyd-led conspiracy was far from the only information upon which the Board relied when it terminated Williams. The Board's attorney independently investigated Williams, reviewing Lloyd's information and files of "wrongfully terminated" employees. (Doc. 19-2 at 5). He concluded "that a pattern of misconduct [by Williams] can be easily demonstrated to support any action the Board might choose to take … ." (*Id.*). Specifically, he reported that Williams had "consistently usurped the authority of the Board and either demoted, terminated, or non-renewed employees … without proper authority." (*Id.*). He advised that Williams's actions "create liability" for DCSS. (*Id.*). Although he had discussed these issues with Williams on "numerous occasions," he reported that she had "continued to operate in a manner inconsistent with the law and the policies" of DCSS. (*Id.* at 5-6.). Based on his review of the files and complaints of other staff members, the attorney reported that "Williams has been abusive to subordinates as well as senior staff resulting in a number of long time employees choosing to resign … ." (*Id.* at 6.). He found a "pattern of abuse and bullying of other employees resulting in a dysfunctional Human Resources Department." (*Id.*). He also found that Williams had improperly signed documents on behalf of teachers and this had resulted in an ethics investigation of Williams. Finally, human resources' staff was "completely demoralized," and the work product of the department was "clearly substandard." (*Id.*).

In addition, Murfree reported to the Board on the incident of the employee allegedly cornered in a file room, an incident that happened while Williams was on probation.  Murfree too recommended Williams's termination at that point.

In short, the Board's legitimate, nondiscriminatory reasons for its actions are many and broad-based, and an allegation of a Lloyd-led conspiracy does not meet "head on" and refute those reasons.

Nor has Williams shown that DCSS more likely than not acted with a discriminatory motive.  Williams argues that the white Board members—Tharin, Ealum, and Maschke—all treated her with disdain, but she has presented no evidence suggesting that any animus towards her was because of her race.  (Doc. 38 at 14). Williams's claim that Tharin asked her to track the number of African-Americans being hired by DCSS is likewise insufficient to suggest that she harbored any racial animus.[17] *See* (Docs. 19-2, ¶ 8; 38-3, ¶¶ 27-29; 49-1, ¶ 4).

Apparently in connection with her pretext argument, Williams invokes the "cat's paw" theory of liability.  (Doc. 38 at 19).  Citing *Staub v. Proctor Hospital*, 562 U.S. 411 (2011), Williams argues that a "subordinate's bias is imputed to the employer if … the biased subordinate influenced or was involved in the decision making process." (*Id.*).  It seems that Williams is attempting to prove pretext by arguing that Lloyd's bias against her can be imputed to the Board.  The problem with this argument is that the "cat's paw" theory of liability requires evidence of *discriminatory* animus on the part of the employee who allegedly influenced the decision maker.  *See, e.g.*, *Stimpson v. City of Tuscaloosa*,

---

[17] The document Williams provided that shows what she did for the Board "regarding … African-American employee hiring" is simply a document providing the sex and race of all employees hired by DCSS.  (Doc. 49-1 at 2-4, 7).

186 F.3d 1328, 1331-32 (11th Cir. 1999).  The question then is whether Williams has adduced evidence of discriminatory animus on the part of Lloyd.  She has not.

First, according to Williams's own testimony, Lloyd's dislike for her stems from her efforts to get him fired because of his fistfight, not because of racial animus.

Second, when asked why she thought Lloyd's behavior was racially motivated, Williams testified that Benford and Skinner were allowed to hire new people in their departments, but she was not.  (Doc. 29 at 86:5-17).  She also testified that Lloyd would make snide remarks and chuckle when he spoke to her, or he would have a "comeback" when she raised an issue or counterpoint in a meeting, which he did not do to Benford and Skinner.  (*Id.* at 86:25-86:18).  She felt that he was singling her out because he treated her differently than Benford and Skinner.  (*Id.* at 88:19-24).  This is not evidence of discriminatory animus.

Finally, Williams's allegation that Lloyd would not adjust the pay of African-American employees when she told him she thought they were being underpaid does not tend to establish discriminatory animus.  First, Williams does not present any evidence suggesting that African-American employees were actually being underpaid.  On the contrary, there is evidence that Williams routinely miscalculated pay when she told employees they were being underpaid.  (Doc. 25 at 16:5-9, 21:2-9, 23:8-10, 55:10-25).  The payroll coordinator testified that "when [employees] thought their check was incorrect, [they] told [her] that they got the pay information from Ms. Williams that was wrong."  (*Id.* at 16:5-9).  Second, there is evidence that any increases in pay would require Board approval, not just Lloyd's approval.  (*Id.* at 24:23-25:3, 34:4-8).  Third, Williams testified that she thought Lloyd refused to pay attention to the alleged pay

discrepancies because the information was coming from her and the "situations preceded [her]," neither of which are reasons suggesting a discriminatory animus on the part of Lloyd.  (Doc. 29 at 84:12-85:16).

In short, the mere fact that Lloyd would not change employee pay for African-Americans when Williams asked him to does not raise an issue of fact whether he harbored racial animus.

Having considered the totality of the circumstances and construed all reasonable evidentiary inferences in Williams's favor, the Court concludes that there is not a genuine issue of material fact on the issue of pretext.  Summary judgment on Williams's disparate treatment claims under Title VII and Section 1983 is **GRANTED**.

### 4.    Retaliation

Williams contends that Lloyd retaliated against her for advocating for equal pay for African-American employees by harassing her in the workplace and by convincing Board members to fire her.  (Doc. 38 at 3-4, 6).  Relying on *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844-45 (1984), Williams argues that the EEOC's finding that DCSS terminated her because of her reports of pay discrimination is entitled to "great weight and deference by the Court."  (Docs. 38 at 13; 38-2 at 12-13).  However, EEOC findings are not binding on subsequent civil suits.  "The district court has the power to *independently* determine the merit of each of the employee's claims."  *Moore v. Devine*, 767 F.2d 1541, 1551 (11th Cir. 1985), *modified on reh'g,* 780 F.2d 1559 (11th Cir. 1986); *see also Muhammad v. Audio Visual Servs. Grp.*, 380 F. App'x 864, 873 (11th Cir. 2010).  Therefore, this Court is not bound by the EEOC's finding of retaliation.

"Absent direct evidence, when analyzing claims for retaliation, we employ the *McDonnell Douglas* analytical framework." *Hawkins v. BBVA Compass Bancshares, Inc.*, 613 F. App'x 831, 838 (11th Cir. 2015).  To establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression.  *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1233 (11th Cir. 2006).  Furthermore, "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action."  *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013).  As with the disparate treatment claim, once a plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer to articulate legitimate reasons for the adverse employment action, and, if the employer does so, a plaintiff has the ultimate burden of showing by a preponderance of the evidence that the employer's reasons were pretextual.  *Holifield*, 115 F.3d at 1564-66.

An employee's speech regarding unfair employment practices is statutorily protected speech if the employment practice is made unlawful by Title VII.  *See Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346 (11th Cir. 1999).  Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation … because of such individual's race."  42 U.S.C. § 2000e-2(a)(1).  Thus, advocating for equal pay for African-Americans is statutorily protected speech.  It is unclear, however, when exactly Williams engaged in this protected activity.  She now says she never reported to the Board about her pay discrepancy study and she never gave it to Lloyd.  (Docs. 29 at 80:19-81:1; 49-1, ¶ 3).  She says she "mentioned it" to Tharin but did not

provide her with a copy.  (Doc. 49-1, ¶ 3).  Despite being ordered to do so, she did not

provide it to the Court.  (Doc. 47).  The most specific Williams ever gets about her

alleged protected activity is that she presented cases of pay discrepancies to Lloyd "[o]n

an intermittent basis."  (Doc. 29 at 80:16-23).  She says she began presenting this

information to Lloyd prior to her letter about his fistfight in August 2010, but the alleged

retaliation began after her efforts to get him fired for the fistfight.  (*Id.* at 24:1-25:16).

She vaguely says Lloyd became "nastier" as she "continued to look into the discrepancy

in pay of African-American employees."  (Doc. 38-3, ¶ 19).

However, assuming that Lloyd's alleged campaign of harassment,[18] her

placement on the PDP, and her firing in May and September 2011 are the adverse

employment actions she complains of, such responses to protected activity can be

adverse employment actions.  *See Clark v. S. Broward Hosp. Dist.*, 601 F. App'x 886,

891-92 (11th Cir. 2015) ("For an action to be 'adverse' in the retaliation context, it 'must

be harmful to the point that [it] could well dissuade a reasonable worker from making or

supporting a charge of discrimination.'" (quoting *Burlington N. & Santa Fe Ry. Co. v.

White*, 548 U.S. 53, 57 (2006) (alteration in original)).  A reasonable worker could well

be dissuaded from continuing to engage in statutorily protected activity when her

supervisor campaigns to have her terminated as a result of that activity.

Williams argues she can link her protected activity with these adverse

employment actions because the harassment was happening simultaneously with the

---

[18] Although Williams never says so, she perhaps meant to assert a retaliatory hostile work environment claim.  To prevail on this claim, she would have to show that: (1) she engaged in protected activity, (2) after doing so, she was subjected to unwelcome harassment, (3) her protected activity was a "but for" cause of the harassment, and (4) the harassment was sufficiently severe or pervasive to alter the terms of her employment.  *Baroudi v. Sec'y, U.S. Dep't of Veteran Affairs*, 616 F.App'x 899, 904 (11th Cir. 2015). Either way, the relevant inquiry is whether she can establish causation.  Moreover, as discussed below, Williams has failed to establish that Lloyd's harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment.

reports of pay discrepancies.  (Doc. 38 at 18-19).  She says that "[t]he more [she] looked into this and reported findings to [Lloyd], he became more difficult to work with." (Doc. 38-3, ¶ 19).  Williams does not specify how the harassment changed or how her reports affected what Lloyd relayed to Board members.  She provides no evidence about how soon after she made a report that Lloyd's treatment would worsen.  Again, she provides no details about these reports, much less when they happened.  Without offering any evidence about the specifics of her protected activity or even when it occurred, Williams cannot show that it was a "but-for" cause of the adverse employment actions she complains of.  This is especially true given that the record clearly shows that her relationship with Lloyd deteriorated because she recommended that he be fired, that she was fired and placed on a PDP because of documented misconduct, and that while on the PDP she was accused of pushing an employee into a file room and making her sob uncontrollably.

Even if she could establish a prima facie case, Williams's retaliation claim would fail because, as discussed, she has failed to provide evidence that DCSS's proffered reasons for its actions were pretext for illegal discrimination.  *See Hawkins*, 613 F. App'x at 839.  Accordingly, summary judgment on the retaliation claim is **GRANTED**.

### 5.    Hostile Work Environment

DCSS moves for summary judgment on any hostile work environment claim, contending that Williams has not adduced sufficient evidence that any alleged harassment was based on race or gender and that the alleged harassment was not sufficiently severe or pervasive to alter the conditions of employment.  (Doc. 19-1 at 19). Although Williams nominally alleges a hostile work environment claim in Count One of

her Amended Complaint, her brief sheds little light on this claim.  Indeed, her brief never addresses the elements of a hostile work environment claim.

"A hostile work environment claim under Title VII is established upon proof that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  To establish a hostile work environment claim, Williams may show that: (1) she is a member of a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based on her membership in the protected group; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a hostile or abusive working environment; and (5) the employer is responsible for that environment under either a theory of vicarious or direct liability.  *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012).

The plaintiff must meet both a subjective and objective test to show the harassing conduct was sufficiently severe or pervasive.  Thus, "[t]he burden is on the plaintiff to demonstrate that he perceived, and that a reasonable person would perceive, the working environment to be hostile or abusive."  *Id.* at 1299 (citation omitted).  When evaluating whether the harassment is objectively severe or pervasive, the Court considers: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Miller*, 277 F.3d at 1276.  It is not sufficient to merely highlight a couple of utterances,

even a couple of racial slurs, as evidence of a hostile work environment; instead, the workplace must be "permeated with 'discriminatory intimidation, ridicule, and insult.'" *Harris*, 510 U.S. at 21 (citation omitted).  The relevant inquiry is "whether, under the totality of the circumstances, a reasonable person would find the harassing conduct severe or pervasive [enough] to alter the terms or conditions of the plaintiff's employment."  *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1251 (11th Cir. 2014).

As far as the Court can tell, Williams possibly argues that she was subjected to a hostile work environment because Lloyd interrupted her meetings, ignored her when she presented her findings about pay discrepancies, told other employees that they did not have to listen to her, did not allow her to fill vacant positions in her department, refused to allow her to discipline her employees, suggested that one of her employees should file a harassment complaint against her, and collected statements from disgruntled former employees to support his campaign against her.  (Doc. 38 at 10-11).

DCSS concedes that Williams subjectively perceived this conduct as severe and pervasive but argues that she cannot meet the objective component of this element because the conduct Williams complains of merely consists of "workplace disputes and differences in opinion about operation of the department" and Lloyd's conduct was not physically threatening.  (Doc. 19-1 at 19).  Williams does not respond to this argument other than quoting the factors the Court considers in evaluating whether a work environment is objectively hostile.  (Doc. 38 at 11).  She does not explain how the conduct she alleges satisfies these factors.  She has not pointed to any evidence, for instance, about the frequency of Lloyd's harassment or that Lloyd physically threatened her.  At most, she has presented evidence that it was more difficult to do her job

because Lloyd was hard to work with, unprofessional, and encouraged her employees not to obey her.  (Doc. 38-3, ¶¶ 11-12, 14, 16, 19).  Accordingly, she has not established that the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment.[19]  *See Alhallaq v. Radha Soami Trading, LLC*, 484 F. App'x 293, 296 (11th Cir. 2012) ("[P]ersonal animosity is not the equivalent of the type of harassment prohibited by Title VII, and the plaintiff cannot turn a personal feud into such a Title VII claim." (citation and internal quotation marks omitted)).

Summary judgment on any hostile work environment claim is **GRANTED**.

### 6.    Pay Discrimination

Williams did not respond to DCSS's motion for summary judgment on her possible claim for pay discrimination.  Instead, she makes broad statements that African-American employees were generally paid less than white employees.  (Doc. 38 at 5, 19).  Therefore, the Court assumes that she did not intend to assert a claim for pay discrimination, or, if she did, she has abandoned it.[20]

---

[19] DCSS also argues Williams cannot establish that the harassment was based on her membership in a protected group.  (Doc. 19-1 at 19).  Given that Williams presented no evidence and made no argument about this element, the Court agrees, and for this additional reason summary judgment is appropriate on any hostile work environment claim she may be asserting.  *See Trask v. Sec'y, Dep't of Veterans Affairs*, 822 F.3d 1179, 1196 (11th Cir. 2016) ("Despite the voluminous incidents of … management's alleged hostility, … management's comments were never related to the plaintiffs' protected characteristics, and there is no evidence that their alleged hostility was in any way motivated by a discriminatory animus regarding the plaintiffs' [protected characteristics].  This alone is fatal to the plaintiffs' claim."); *see also Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 809 n.3 (11th Cir. 2010) ("Title VII is not a civility code, and … harassment must discriminate on the basis of a protected characteristic in order to be actionable.").

[20] Even if Williams did intend to assert a pay discrimination claim, she offers no evidence of her pay, much less the pay of a similarly situated comparator who was paid more.  *See Lee v. Mid-State Land & Timber Co., Inc.*, 285 F. App'x 601, 606 (11th Cir. 2008) ("In order to establish a prima facie case of intentional compensation discrimination based on race, the plaintiff must establish that: (1) [she] belongs to a racial minority; (2) received low wages; (3) similarly situated comparators outside the protected class received higher compensation; and (4) [she] was qualified to receive the higher wage.").  Although not mentioned in Williams's brief, the Court notes that she testified that one employee was paid more even though they supervise the same number of employees.  (Doc. 29 at 40:25-41:11).  However, there is no evidence that the Court can find, and again certainly no argument in her brief, that their respective jobs

Williams briefly argues that there is a pattern and practice of pay discrimination at DCSS against African-American employees. (*Id.* at 21). The purpose of this paragraph is unclear. Regardless, "[a] private litigant … cannot maintain a pattern or practice claim unless it is brought as a class action and a class is certified." *Shaw v. Mobile Cty. Pub. Sch. Sys.*, 84 F. Supp. 3d 1303, 1310 (S.D. Ala. 2015). Accordingly, Williams cannot bring a pattern and practice claim as an individual plaintiff.

Summary judgment on Williams's pay discrimination claim is **GRANTED**.

### 7.    Mosaic Theory

The Court recognizes that establishing the *McDonnell Douglas* elements is not "the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed–Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). A plaintiff can always avoid summary judgment by creating a triable issue concerning the employer's discriminatory intent. A plaintiff can do this by presenting "'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decision maker.'" *Id.* (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 734 (7th Cir. 2011)). However, as discussed, Williams has not presented "a convincing mosaic of circumstantial evidence" that DCSS acted with discriminatory intent. On the contrary, even if Williams could create a genuine issue of fact as to whether DCSS's reasons for terminating her were false, this would be the "rare case" where "no rational jury could conclude that the [employer's action] was discriminatory." *Motley*, 815 F.3d at 734.

---

had similar qualifications or that the jobs required similar skill and effort. *See Hooper v. Total Sys. Servs., Inc.*, 799 F. Supp. 2d 1350, 1364 (M.D. Ga. 2011). Thus, any claim for pay discrimination fails because Williams has not established her prima facie case.

## III. CONCLUSION

For the foregoing reasons, DCSS's motion for summary judgment is **GRANTED**.

(Doc. 19).

**SO ORDERED**, this 18th day of August, 2016.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT